Slip Op. 16-65

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| IKEA SUPPLY AG, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br>  and <br><br> ALUMINUM EXTRUSIONS <br> FAIR TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 15-00153 |

**OPINION AND ORDER**

[Plaintiff's motion for judgment on the agency record is denied.]

Dated: July 5, 2016

*Kristen S. Smith*, *Mark R. Ludwikowski*, *Arthur K. Purcell*, and *Michelle L. Mejia*, Sandler Travis & Rosenberg P.A., of Washington, DC, for plaintiff.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistance Director. Of counsel on the brief was *David P. Lyons*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Alan H. Price*, *Robert E. DeFrancesco, III*, and *Derick G. Holt*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor.

GOLDBERG, Senior Judge:

Plaintiff IKEA Supply AG ("IKEA") challenges a decision by the U.S. Department of

Commerce ("Commerce") interpreting the scopes of two antidumping and countervailing duty

orders (the "Orders," which state their scopes in essentially identical terms) to include towel racks that IKEA imported. Final Scope Ruling, PD 39 (Apr. 27, 2015) (interpreting *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) ("*AD Order*"); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) ("*CVD Order*")).[1] The orders apply to certain "aluminum extrusions" from the People's Republic of China. *AD Order*, 76 Fed. Reg. 30,650.

IKEA has moved for judgment on the agency record, arguing that Commerce should have found the towel racks to be excluded from the Orders' scope. Defendant United States ("the Government") and defendant-intervenor Aluminum Extrusions Fair Trade Committee oppose plaintiff's motion. The court affirms Commerce's decision interpreting the Orders' scope to include IKEA's towel racks.

### BACKGROUND

Commerce issued the Orders in May 2011. *AD Order*, 76 Fed. Reg. 30,650. The Orders include within their scope "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)." *Id.* at 30,650.

The Orders exclude from their scope "finished merchandise" and "finished goods kits." *Id.* at 30,651. Under the "finished merchandise" exclusion, "[t]he scope . . . excludes finished

---

[1] Because the Orders' scopes are essentially identical, the court cites only to the antidumping duty order when rehearsing the scopes' inclusions and exclusions, and, starting now, refers to the Orders' scopes, inclusions, exclusions, and so on, in the singular.

merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *Id.* And under the "finished goods kits" exclusion,

> [t]he scope . . . excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

*Id.*

On January 16, 2014, IKEA requested a scope ruling on two types of its towel racks. Scope Review Ruling Req. 2, PD 1 (Jan. 16, 2014). In its request, IKEA described the racks as "made of aluminum extrusions." *Id.* at 6. Commerce later issued a supplemental questionnaire, and as part of IKEA's response IKEA differentiated the two types of racks by the parts packaged with the racks. Suppl. Questionnaire Response: IKEA Supply AG 1, PD 9 (Apr. 2, 2014). According to the questionnaire response, one type of rack includes "a plastic gasket and a steel bracket," while the other includes just "a steel bracket." *Id.* IKEA also specified that, with the parts included in the rack packages, the racks are "ready to be used." *Id.* at 2.

In the scope ruling request, IKEA maintained that the towel racks qualified for the "finished merchandise" exclusion from the Orders' scope. *See* Scope Review Ruling Req. 2–3. IKEA did not raise any parallel contention concerning the "finished goods kit" exclusion. *Id.*

The regulation that governs Commerce's scope rulings provide an interpretive framework through which the agency can decipher ambiguous scope language. 19 C.F.R. § 351.225(k).

However, the Federal Circuit has cautioned that "a predicate for the interpretive process is language in the order that is subject to interpretation." *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1383 (Fed. Cir. 2005) (citing *Duferco Steel Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)).

> If Commerce determines that the language at issue is not ambiguous, it states what it understands to be the plain meaning of the language, and the proceedings terminate. On the other hand, if Commerce finds that the scope language is ambiguous, it then looks to two sets of factors spelled out in [19 C.F.R. § 351.225(k)(1) and (2)] to determine the intended scope of the order.

*ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 84 (Fed. Cir. 2012). 19 C.F.R. § 351.225(k)(1) instructs Commerce to "take into account" the relevant order's regulatory history, as contained in "[t]he descriptions of the merchandise contained in the petition, [Commerce's] initial investigation, and the [prior] determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission."

> If the . . . materials [listed in 19 C.F.R. § 351.225(k)(1)] are not dispositive, Commerce then considers the . . . criteria [listed in 19 C.F.R. § 351.225(k)(2)]: "[t]he physical characteristics of the product," "[t]he expectations of the ultimate purchasers," "[t]he ultimate use of the product," "[t]he channels of trade in which the product is sold," and "[t]he manner in which the product is advertised and displayed."

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013).

Commerce issued its final scope ruling on April 27, 2015. At the outset, Commerce described IKEA's two towel racks as follows: "[One model] is comprised of a[n] . . . aluminum extrusion and a plastic gasket; [the other model] is comprise of a[n] . . . aluminum extrusion with two steel brackets." Final Scope Ruling 2. No party contests Commerce's description before this court.

After looking to "the sources listed in [19 C.F.R. § 351.225(k)(1)]," Commerce concluded that "IKEA's towel racks are covered by the scope." Final Scope Ruling 10. The

"finished merchandise" exclusion did not apply because the exclusion requires eligible merchandise to include aluminum extrusions "as parts." *Id.* at 11. Commerce took the "as parts" requirement to mean that the merchandise had to be assembled from aluminum extrusions "plus an additional non-extruded aluminum component." *Id.* IKEA's towel racks did not meet this requirement because both were "comprised entirely of extruded aluminum and d[id] not have [an]other non-extruded aluminum component, aside from fasteners ([for example,] a plastic gasket)." *Id.* According to Commerce, fasteners could not qualify as eligible non–extruded aluminum components because the "finished goods kit" exclusion expressly provided that including fasteners would not transform otherwise unqualifying merchandise into a "finished goods kit." *Id.* at 12. Commerce said it would be inconsistent to read the "finished merchandise" exclusion without a matching requirement. *Id.* And Commerce classified the plastic gaskets and steel brackets packaged with IKEA's towel racks as fasteners because IKEA had described those components as being "used as sturdy plates that are affixed to the wall for the towel racks to be attached in order to provide stability for the rack to hold towels." *Id.* at 11 (quoting IKEA Rebuttal Comments 3, PD 34 (Nov. 17, 2014)). This description accorded with some online dictionary definitions that Commerce had found for "fastener." *Id.* at 11 & n.41.

IKEA commenced this action by filing a summons with this court on May 27, 2015. Summons, ECF No. 1. IKEA has moved for judgment on the agency record, contending that its towel racks are excluded from the scope of the order under the "finished merchandise" exclusion or, alternatively, the "finished goods kit" exclusion. Pl.'s 56.2 Mot. for J. on Agency R., ECF No. 30.[2]

---

[2] IKEA also states in its lead brief that an oral argument "is requested." Mem. Supp. Pl.'s Mot. 23, ECF No. 30-1. Despite this request, IKEA has not moved for oral argument. In any event, the court does not believe that oral argument is necessary to resolve the issues IKEA has raised, which are straightforward.

**JURISDICTION AND STANDARD OF REVIEW**

The court exercises jurisdiction under 28 U.S.C. § 1581(c) (2012).  In reviewing Commerce's scope ruling, the court must set aside "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

"Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty order."  *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citing *Tak Fat Trading*, 396 F.3d at 1382).  "This broad deference is not unlimited, however, since 'Commerce cannot interpret an antidumping duty order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms.'"  *Id.* (quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010)).  "[M]erchandise facially covered by an order may not be excluded from the scope of the order unless the order can reasonably be interpreted so as to exclude it."  *Mid Continent*, 725 F.3d at 1301.

**DISCUSSION**

The court affirms Commerce's scope ruling.  IKEA's towel racks do not qualify for the "finished merchandise" exclusion because they are not assembled with other parts.  Similarly, the towel racks do not meet the requirements of the "finished goods kit" exclusion because, besides fasteners, the towel racks consist of a single aluminum extrusion.

**I.        IKEA's Towel Racks do not Qualify for the "Finished Merchandise" Exclusion.**

In order to be eligible for the "finished merchandise" exclusion, merchandise must contain aluminum extrusions "as parts" and be "fully and permanently assembled."  *AD Order*, 76 Fed. Reg. at 30,651.  As imported, IKEA's towel racks consist of a single aluminum

extrusion, unassembled with any other parts. Because IKEA's towel racks are not imported assembled with other parts, they cannot qualify for the "finished merchandise" exclusion.

IKEA levies several arguments to forestall this commonsense conclusion. First, IKEA argues that Commerce misinterpreted the "as parts" part of the "finished merchandise" exclusion by requiring "finished merchandise" to "include some non-aluminum extrusion component." Mem. Supp. Pl.'s Mot. 7, ECF No. 30-1. IKEA also characterizes Commerce's interpretation as adding an "aluminum extrusions content requirement" where none should exist. *Id.* at 17. Second, IKEA argues that Commerce added still another requirement to the "finished merchandise" exclusion: namely, the provision relating to fasteners, which is part of the "finished goods kit" exclusion. *Id.* at 8. IKEA further insists that the plastic gaskets and steel brackets packaged with its towel racks are not fasteners in any case. *Id.* at 11. Finally, IKEA argues that "finding IKEA's imports outside the scope of the [Orders] is consistent with the subassembly test." *Id.* at 16.

IKEA's arguments fail because they do not change the fundamental fact that IKEA's towel racks are single extrusions not assembled with other parts. In *Whirlpool Corporation v. United States*, Slip Op. 16-8 at 3, 2016 WL 385454 (CIT Feb. 1, 2016), the court addressed whether similar merchandise—door handles consisting of "a single aluminum extrusion . . . imported with an Allen wrench and two stainless steel set screws"—satisfied the "finished merchandise" exclusion. The court held that the door handles did not meet the "finished merchandise" exclusion because "the one-piece handles do not contain extrusions as parts and are not assemblies." *Id.* at 8. The fact that the door handles were imported with screws was irrelevant to the "finished merchandise" analysis, because the handles were not assembled with those screws. *See id.*

IKEA cannot steer clear of the *Whirlpool Charybdis*. *The Odyssey of Homer*, Book XII. IKEA's towel racks have one piece, the extrusion, and are not imported assembled together with other parts. Although IKEA's towel racks come with plastic gaskets or steel brackets, these components are merely packaged with the towel racks, not assembled with them. The "finished merchandise" exclusion therefore does not apply.[3]

This does not mean that IKEA's arguments lack any persuasive force. In particular, the court agrees with IKEA that the "finished merchandise" exclusion does not have a "fasteners" exception mirroring the one in the "finished goods kit" exclusion. As this court noted in *Meridian Products, LLC v. United States*, 39 CIT __, __, 125 F. Supp. 3d 1306, 1315–16 (2015), "[T]here is . . . an interpretive difficulty with [Commerce's] apparent reasoning that the presence of fasteners is to be disregarded for purposes of applying the finished merchandise exclusion. The difficulty is that the finished merchandise exclusion contains no reference to fasteners." Commerce argues that limiting the "fasteners" exception to "finished goods kits" would lead to inconsistent results. Def.'s Resp. to Pl.'s Mot. 13, ECF No. 32. That is Commerce's problem, because the agency drafted the Orders. Unfortunately for IKEA, though, the spat of bad reasoning in Commerce's scope ruling does not transform IKEA's towel racks into multipart assemblies, as they must be to qualify as "finished merchandise."[4]

---

[3] The parties bicker about whether IKEA conceded in briefing that its towel racks are unassembled. Commerce points to the portion of IKEA's brief addressing the "finished goods kit" exclusion, in which IKEA describes the towel racks as an "unassembled combination of parts." Def.'s Resp. to Pl.'s Mot. 10, ECF No. 32 (quoting Mem. Supp. Pl.'s Mot 15). IKEA rebuts that it was simply making an argument in the alternative, which is standard and permissible practice. Pl.'s Reply 8, ECF No. 35. Whether or not IKEA "conceded" in briefing that its towel racks are unassembled, no party contests the description of the product given by Commerce: a single aluminum extrusion packaged but not assembled with fasteners. It is that description that is dispositive in this case.

[4] As mentioned, IKEA also takes issue with Commerce's contention that "finished merchandise" must "include some non-aluminum extrusion component." Mem. Supp. Pl.'s Mot. 7. According to IKEA, nothing in the Orders suggests that "finished merchandise" has to be assembled from components besides aluminum extrusions. *Id.* Relatedly, IKEA contends that Commerce's interpretation expands the scope of the Orders by adding an "aluminum extrusion content requirement." *Id.* at 17. IKEA further alleges that this requirement is arbitrary and

[footnote continued]

## II.     IKEA's Towel Racks do not Qualify for the "Finished Goods Kit" Exclusion.

The "finished goods kit" exclusion applies to "packaged combination[s] of parts that contain[] . . . all of the necessary parts to fully assemble a final finished good." *AD Order*, 76 Fed. Reg. at 30,651.  For purposes of this exclusion, "fasteners" do not count as "parts." *Id.* IKEA's towel racks do not qualify for the "finished goods kit" exclusion because the towel racks consist of a single aluminum extrusion packaged alongside fasteners.[5]

Once again, IKEA objects.  IKEA first argues that the towel racks are covered by the "finished goods kit" exclusion because they come with all the parts necessary for assembly, namely the racks themselves plus a plastic gasket or steel brackets.  Mem. Supp. Pl.'s Mot. 15. According to IKEA, the "fasteners" exception does not apply because that exception is designed

capricious because it is inconsistent with prior scope rulings. *Id.* at 18–19.  IKEA adds that Commerce's reading leads to an absurd result: "Under [Commerce's] analysis, a towel rack manufactured with aluminum is subject to the [Orders], yet a virtually identical towel rack with a small number of decorative crystals would be excluded simply based upon its non-aluminum content." *Id.* at 19.

The court deems it best to leave these questions open.  Whatever the answers are, they cannot affect IKEA's towel racks, which are not assemblies at all, but instead consist of single aluminum extrusions unassembled with other parts.  IKEA's arguments are best addressed when IKEA actually starts importing merchandise that could be excluded based on those arguments.  Because IKEA has not yet begun bedazzling its housewares, nor importing them alongside less sparkly, extrusion-only assemblies, the court will hold off for now. *Cf. Rubbermaid Commercial Prods. LLC v. United States*, Slip Op. 15-79 at 7–9 & n.2, 2015 WL 4478225 (CIT July 22, 2015) (declining to address the same argument because it would not affect the merchandise then before the court).

Likewise, the court need not address IKEA's argument that the plastic gaskets and steel brackets are not "fasteners," at least not for purposes of the "finished merchandise" exclusion.  Mem. Supp. Pl.'s Mot. 11.  Whether fasteners or not, the gaskets and brackets are not assembled with IKEA's towel racks, and so are irrelevant to the "finished merchandise" analysis.  (The court does need to address whether the gaskets and brackets are "fasteners" to resolve IKEA's "finished goods kit" argument, and does so below.)

Finally, the court need not address IKEA's argument that "finding IKEA's imports outside the scope of the Orders [would be] consistent with the subassembly test."  Mem. Supp. Pl.'s Mot. 16.  According to IKEA, the "subassemblies test allows for subassemblies to be excluded from the scope of the order provided that they are imported as finished goods. . . . Because IKEA's towel racks are finished merchandise, they satisfy the finished merchandise exception to the [Orders]." *Id.*  In other words, IKEA's subassembly argument is predicated on the assumption that IKEA's towel racks otherwise meet the "finished merchandise" exclusion.  They don't, so the court will skip consideration of IKEA's subassembly argument.

[5] Commerce takes the position that IKEA failed to exhaust its argument that the "finished goods kit" exclusion covers its towel racks because IKEA did not present the argument before the agency.  Def.'s Resp. to Pl.'s Mot. 21.  By statute, this court must "require the exhaustion of administrative remedies" where appropriate.  28 U.S.C. § 2637(d).  However, requiring exhaustion can be inappropriate in certain circumstances, including when the relevant argument concerns a "pure question of law." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).  Because the language of the "finished goods kit" exception is unambiguous, whether that exception applies can be resolved as a matter of law.  The court therefore declines to require exhaustion in this case.

only to prevent circumvention of the Orders by "merely" including fasteners alongside merchandise that would otherwise fall within the Orders' scope. *Id.* In support of this argument, IKEA marshals the aforementioned *Meridian Products*, 39 CIT __, 77 F. Supp. 3d 1307. IKEA also again argues that the plastic gasket and steel brackets are not fasteners within the meaning of the exclusion. *See* Mem. Supp. Pl.'s Mot. 12.

IKEA's arguments fail to convince. In *Meridian*, the court considered whether trim kits consisting "entirely of subject aluminum extrusions, fasteners, and 'extraneous' materials" satisfied the "finished goods kit" exclusion. 39 CIT at __, 77 F. Supp. 3d at 1311. Commerce took the position that the trim kits did not satisfy the exclusion, and predicated its stance on the language of the "fasteners" exception. *Id.* The court disagreed with Commerce's reading. *Id.* at __, 77 F. Supp. 3d at 1316–17. The court explained that the unambiguous language of the Orders revealed three requirements for the "finished goods kit" exclusion:

> The kit must be (1) an unassembled combination of parts that (2) includes at the time of importation *all* of the necessary parts to fully assemble a final finished good, with no further finishing or fabrication (such as cutting or punching), and (3) be capable of assembly 'as is' into a finished product.

*Id.* at __, 77 F. Supp. 3d at 1316. The court continued,

> The inclusion of 'fasteners' or 'extraneous materials' is not determinative when qualifying a kit consisting of multiple parts which otherwise meets the exclusionary requirements[] as a 'finished goods kit[.'] Likewise, there is nothing in the language that indicates that the parts in an otherwise qualifying kit cannot consist entirely of aluminum extrusions. . . .

> The "clarification" language [that is, the "fasteners" exception, which Commerce had described as a "clarification,"] does not support Commerce's reading of the ["finished goods kit" exception], but is instead simply an attempt to prevent the circumvention of the scope of the [Orders] by ensuring that the "mere" inclusion of fasteners in a packaged aluminum extrusion product, that does not otherwise meet the scope-exclusion requirements, will not qualify it as a "combination of parts" for the "finished goods kit" exclusion.

*Id.* at __, 77 F. Supp. 3d at 1316–17.

IKEA clings to the court's characterization of the "fasteners" exception as "an attempt to prevent the circumvention" of the Orders. Mem. Supp. Pl.'s Mot. 13. IKEA says that it did not "merely" include the plastic gaskets and steel brackets to skirt the Orders. *Id.* at 15. "Rather, the [gaskets and brackets] are included in the combination of parts that form the final finished product." *Id.*

IKEA reads *Meridian* too broadly. In describing the "fasteners" exception as "an attempt to prevent circumvention" of the Orders, the *Meridian* court was only rebutting Commerce's argument that the language of the "fasteners" exception gave the agency grounds to include the trim kits (which consisted "entirely of subject aluminum extrusions, fasteners, and 'extraneous' materials") within the Orders' scope. 39 CIT at __, 77 F. Supp. 3d at 1311, 1316–17. As the court read the "fasteners" exception, it did not provide grounds for including kits comprised entirely of aluminum-extrusion parts. *Id.* That was all the court said on the subject of the "fasteners" exception. *Id.*

The *Meridian* court did, however, set forth the plain requirements of the "finished goods kit." *Id.* at __, 77 F. Supp. 3d at 1316. IKEA's towel racks do not meet those requirements. Specifically, the towel racks are not "an unassembled combination of parts," because the towel racks consist of a single aluminum extrusion (not multiple extrusions) plus fasteners. *Id.* The "fasteners" exception clearly states that, within the context of the "finished goods kit" exclusion, "fasteners" do not count as "parts." *AD Order*, 76 Fed. Reg. at 30,651. Addressing the door handles at issue in *Whirlpool*, this court held that a sole aluminum extrusion is not an unassembled combination of parts for purposes of the "finished goods kit" exclusion. Slip Op. 16-8 at 8. Nor, relatedly, is a single extrusion a kit. *Id.*; *see also Meridian Prods., LLC v. United States*, Slip Op. 16-5 at 2, 2016 WL 270238 (CIT Jan. 20, 2016) ("The court fails to understand

why . . . it would be reasonable to argue that a single part shipped with mere fastener(s) is a 'kit[.]'").

As noted, IKEA also contends that the plastic gasket and steel brackets are not "fasteners" at all (and therefore should be counted as "parts" of a kit). Mem. Supp. Pl.'s Mot. 11. According to IKEA,

> the plastic gaskets and steel brackets . . . are not fasteners used to fasten aluminum extrusions or assemble the towel racks. Nor do they attach the towel rack to the wall like a screw or a bolt. Rather, they serve a separate and distinct function, to provide stability to the rack.

*Id.* (citation omitted).

Contrary to IKEA's argument, the plastic gaskets and steel brackets are "fasteners." This court has advised that the term "fasteners" as used in the Orders should "be given its common and commercial meaning." *Meridian*, 39 CIT at __, 125 F. Supp. 3d at 1314. *Merriam-Webster's*[6] does not define "fastener," but defines "fasten" as "to attach esp[ecially] by pinning, tying, or nailing," "to make fast and secure," and "to fix firmly or securely." *Merriam-Webster's Collegiate Dictionary* 455 (11th ed. 2009). The "fasteners" exception provides additional guidance on what constitutes a "fastener" by listing "screws" and "bolts" as examples. *AD Order*, 76 Fed. Reg. at 30,651. Before Commerce, IKEA described the plastic gaskets and steel brackets as being "used as sturdy plates that are affixed to the wall for the towel racks to be attached in order to provide stability for the rack to hold towels." Final Scope Ruling 11 (quoting IKEA Rebuttal Comments 3, PD 34 (Nov. 17, 2014)). Because the gaskets and brackets are the means by which the towel racks are attached to walls (the towel racks attach to

---

[6] Not *Webster*, one of two online dictionaries that Commerce used. *Webster* is unaffiliated with *Merriam-Webster's* and sourced from a version of *Webster's* now in the public domain because it was published in 1913. *See Sources*, Webster Dictionary, http://www.webster-dictionary.org/sources.htm (last visited July 5, 2016). (*Webster* also provides access to other definitional sources evidently in the public domain, which is commendable. However, for the court's purposes, it is important to use more up-to-date and verifiable source material.)

the gaskets and brackets, which in turn attach to walls), the gaskets and brackets are fasteners. This conclusion is consistent with the specific examples of fasteners listed in the exception, because those examples also serve an attachment purpose.[7]

Because the plastic gaskets and steel brackets are fasteners, they do not count for purposes of determining whether IKEA's towel racks constitute a "finished goods kit." Leaving fasteners out, IKEA's towel racks are not "unassembled combination[s] of parts," nor kits, because they consist of single extrusions. The "finished goods kit" exception therefore does not apply.

## CONCLUSION AND ORDER

For the foregoing reasons, the court sustains Commerce's final scope ruling. Accordingly, upon consideration of all papers and proceedings in this case and upon due deliberation, it is hereby

**ORDERED** that Commerce's Final Scope Ruling is affirmed.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: July 5, 2016
New York, New York

---

[7] IKEA also argues that "Commerce failed to employ the *Diversified Products* analysis which would further support a finding that IKEA's towel racks are out-of-scope merchandise." Mem. Supp. Pl.'s Mot. 19. By "*Diversified Products* analysis," IKEA means the multifactorial analysis laid out in 19 C.F.R. § 351.225(k)(2). *Id.* Commerce does not engage in a (k)(2) analysis unless it finds that the relevant order is ambiguous and that the (k)(1) factors do not resolve the ambiguity. In this case, the Orders are unambiguous in all relevant respects. Hence, it does not matter that that some of the (k)(2) factors may favor IKEA (including that "[t]he style of the towel rack is important. . . . Towel racks differ in style. Certain racks are large to hold big, fluffy towels. Others are small to hold fingertip towels"). Mem. Supp. Pl.'s Mot. 20. Commerce had no occasion to consider those factors.